UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| KAREN SCARBROUGH, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | Case No.: 2:16-CV-1283-RDP |
| } | |
| TRANSPLANT RESOURCE CENTER OF } | |
| MARYLAND, INC., et al., } | |
| } | |
| Defendants. } | |

## MEMORANDUM OPINION

This matter is before the court on the Motion to Dismiss for Lack of Personal Jurisdiction (Doc. # 21), filed by Defendant Transplant Resource Center of Maryland, Inc. d/b/a The Living Legacy Foundation of Maryland ("Living Legacy"). The Motion has been fully briefed. (Docs. # 22-25).

**I.   Background**

Living Legacy is a non-profit corporation incorporated under the laws of the state of Maryland with its principal place of business in Arbutus, Maryland. (Doc. # 1-1 ¶ 2; Doc. # 21-2 p. 184). Living Legacy is a certified and accredited organ procurement organization ("OPO") that procures deceased-donor organs for organ transplantation. (Doc. # 21-2 p. 16). There are 58 OPOs operating in the United States. (Doc. # 21-2 p. 32-33). Each OPO is responsible for organ procurement in a specific service area; Living Legacy's service area is a portion of the state of Maryland. (Doc. # 21-2 p. 33-34). OPOs also are assigned a region; Living Legacy's region is Region 2, which includes New Jersey, the District of Columbia, and parts of Pennsylvania. (Doc. # 21-2, p. 40, 95-96).

OPOs are members of the Organ Procurement and Transplantation Network (OPTN), which is a federally-established network. (Doc. # 21-3 at p. 2). The United Network for Organ Sharing (UNOS) serves as the OPTN under contract with the Health Resources and Services Administration (HRSA) of the United States Department of Health and Human Services (DHHS). (Doc. # 21-3 at p. 2-3). The process for determining who will receive the donated organs is as follows: UNOS has created a computerized network which matches donated organs with transplant candidates by applying certain matching criteria. (Doc. # 21-3 at p. 3). These matching criteria are programmed into the UNOS database. (*Id.*). When a transplant hospital accepts a person as a transplant candidate, it enters into the UNOS database medical data about that person, such as the person's blood type, medical urgency, and location of the transplant hospital. Included in that information is whether a candidate would entertain a high-risk organ. (Doc. # 22-1 at 2-19)[1].

When an organ procurement organization such as Living Legacy obtains authorization from an organ donor, it enters into the UNOS database medical data such as the donor's blood type, body size, and the location of the donor hospital. (Doc. # 21-2, p. 188-190). The UNOS database then generates a "match run" using the combination of donor and candidate information to create a rank-ordered list of potential recipients (or candidates) to be offered each donated organ. (Doc. # 21-2, p. 188-190). With respect to a particular donor's kidney, the candidates who appear highest in the ranking are those who are an exact match. Thereafter, all other things being equal, local and regional candidates are given priority, with national candidates listed afterward. (Doc. # 21-2, p. 188-190). Living Legacy has no control over the "match run" list that is

---

[1] *See also* https://optn.transplant.hrsa.gov/learn/about-transplantation/donor-matching-system/ (last visited March 21, 2017).

2

generated pursuant to the UNOS database. (*Id.*). Plaintiff's name was one-hundred and twenty-second on the list. (*Id.*).

With respect to its local and regional matches (*i.e.*, candidates in Maryland, D.C., New Jersey, and parts of Pennsylvania and Northern Virginia), Living Legacy makes the offer and receives the acceptance. (Doc. # 21-2, p. 190). For national candidates, like Plaintiff in this case, UNOS makes the offer, receives the acceptance, and then notifies Living Legacy of the acceptance. (Doc. # 21-2, p. 191-92). The offer is made to the candidate's transplant surgeon, and the decision whether to accept the organ is made by that surgeon, either in consultation with the potential recipient or alone. (Doc. # 21-2, 188, 192). Neither Living Legacy nor UNOS determines who will receive the organ. (Doc. # 21-2, p. 188, 192-93)

When a kidney is being transplanted locally or regionally, Living Legacy arranges the transportation of the kidney from the procurement site to the transplant hospital or the OPO for that service area. (Doc. # 22-1, p. 29, 62-64). When, however, the organ is being sent to a national recipient, UNOS arranges for the transportation. (Doc. # 22-1, p. 29). In either case, Living Legacy does not fill out the address of the organ's destination, someone else (perhaps the courier) addresses the label. (Doc. # 22-1, at p. 48-49, 51). Living Legacy only affixes a UNOS-supplied label that contains information related to the donor UNOS number, the donor's blood type, the contents of the box, and Living Legacy's address.  (Doc. # 22-1, p. 55-57, 64; Doc. # 22-1 at 63-64).

In this case, UNOS offered the kidney to Plaintiff, an Alabama recipient, Plaintiff's Alabama surgeon accepted, and UNOS coordinated with Sterling Courier to pick up the kidney for delivery to Alabama. (Doc. # 22-1, at p. 64). Sterling Courier, or someone at Sterling's direction, filled out the label indicating that the kidney was to be transported to Alabama.  (Doc.

3

# 22-1, at p. 81-85). Typically, Sterling picks up the organ from Living Legacy, transports it to the airport, and puts it on a commercial airline. (Doc. # 22-1, at p. 87).

Other than the kidney at issue in this case, no kidneys procured by Living Legacy have been sent to Alabama in the last twelve years. (Doc. # 24 at 4). A total of ten (10) kidneys procured by Living Legacy have been sent to Alabama. (Doc. # 24 at 4). Those transplants occurred between 1991 and 2002. (Doc. # 24 at 4).

The crux of Plaintiff's Complaint in this case is that, when Plaintiff was notified of the availability of a kidney for her transplant, she traveled from Florida to Birmingham's University of Alabama Hospital to undergo the transplant. (Doc. # 1-1 ¶ 16). Plaintiff was admitted at the hospital and prepared for surgery. (Doc. # 1-1 ¶ 17). Thereafter, it was discovered that, allegedly due to improper packaging and/or transport, the kidney could not be used for Plaintiff's transplant. (Doc. # 1-1 ¶ 24).

## II.    Standard of Review

A Rule 12(b)(2) motion tests the court's exercise of personal jurisdiction over a defendant. *See* Fed. R. Civ. P. 12(b)(2). "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009); *see also Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999) ("A plaintiff seeking to obtain jurisdiction over a nonresident defendant initially need only allege sufficient facts to make out a prima facie case of jurisdiction."). If a plaintiff satisfies his initial burden and a defendant then challenges personal jurisdiction by submitting affidavit evidence in objection to personal jurisdiction, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction. *See Meier ex rel. Meier v. Sun*

*International Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002); *see also Posner*, 178 F.3d at 1214 ("The plaintiff bears the burden of proving 'by affidavit the basis upon which jurisdiction may be obtained' only if the defendant challenging jurisdiction files 'affidavits in support of his position.'" (citation omitted)). When the issue of personal jurisdiction is decided on the evidence, but without a discretionary hearing, a plaintiff demonstrates a "prima facie case of personal jurisdiction" by submitting evidence sufficient to defeat a motion made pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1317 (11th Cir. 2006). At this evidentiary juncture, the court construes the complaints' allegations as true if they are uncontroverted by affidavits or deposition testimony, *id.*, and where there are conflicts, the court "construe[s] all reasonable inferences in favor of the plaintiff[s]." *Whitney Info. Network, Inc. v. Xcentric Ventures, LLC*, 199 F. Appx. 738, 741 (11th Cir. 2006) (unpublished) (quoting *Meier*, 288 F.3d at 1269).

### III.     Analysis

In addressing Alabama's law regarding personal jurisdiction under the circumstances of this case, this court is not writing on a blank slate. In 2006, the Alabama Supreme Court considered whether there was personal jurisdiction over a non-resident defendant in a remarkably similar case involving a human organ for transplant. *Ex parte Hosp. Espanol de Auxilio Mutuo de Puerto Rico, Inc*., 945 So. 2d 437 (Ala. 2006).

In that case, a Puerto Rican hospital petitioned the Alabama Supreme Court for a Writ of Mandamus directing the Jefferson County Circuit Court to vacate an order denying its Motion to Dismiss for Lack of Personal Jurisdiction. (*Id.* at 438). The plaintiffs had sued Life Link Foundation, Inc., Alabama Organ Center and Auxilio Mutuo (the Puerto Rican hospital) alleging that a kidney that the plaintiff had received by transplant at the University of Alabama

Birmingham was infected with Hepatitis C. (*Id*). The plaintiffs alleged that Auxilio Mutuo negligently or wantonly caused or allowed inadequate, improper or erroneous testing to be performed on the serology test of the donor kidney. (*Id.*). Auxilio Mutuo moved to dismiss the complaint on the basis that the trial court lacked personal jurisdiction over it. (*Id.*). After a period of limited discovery and the filing of affidavits, the trial court denied Auxilio Mutuo's Motion to Dismiss. (*Id.* at 439).

Life Link Foundation, Inc. and its affiliate Life Link of Puerto Rico were members of the UNOS. Its UNOS regions including transplant centers located in Alabama, as well as Puerto Rico. (*Id.* at 439). Organs recovered for transplant were allocated and shared for transplant on a local and regional basis. (*Id.*). Auxilio Mutuo Hospital was a member of UNOS located in the same region as the University of Alabama Hospital in Birmingham. (*Id.* at 440). Auxilio Mutuo's clinical laboratory routinely performed serological testing on organs and/or tissue recovered from donors in Puerto Rico. (*Id.*). The organs were shared throughout the United States, with a significant majority being placed in Region 3 which included Alabama. (*Id.*). The affidavit supplied by Life Link also established that between 1994 and 2001, 7% of the kidneys and bone grafts recovered within UNOS Region 3 ended up in Alabama hospitals. (*Id.*). Evidence submitted by Auxilio Mutuo indicated that it did not determine where an organ/bone graft donated from Puerto Rico would be sent outside of the Commonwealth of Puerto Rico. (*Id.* at 441).

After agreeing to hear the Petition for Writ of Mandamus, the Alabama Supreme Court concluded that Alabama did not have personal jurisdiction over the Puerto Rican hospital. (*Id.* at 447). The court explained its reasoning as follows:

> We also agree with Auxilio Mutuo that the Holsenback's evidence does not establish that Auxilio Mutuo has minimum contacts with this state so as to

> establish personal jurisdiction. In particular, the evidence does not establish a nexus between Auxilio Mutuo and Alabama arising out of "an action of [Auxilio Mutuo that was] purposely directed toward [Alabama]." *Elliott v. Van Kleef*, 830 So.2d 726, 731 (Ala. 2002)) quoting *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 112, (1987)). While we agree with the Holsombacks and Respondent Life Link that Auxilio Mutuo provided an important link in the organ transplant process, *the evidence does not establish that Auxilio Mutuo had a substantial connection with Alabama*. Although Auxilio Mutuo does test organs and bone grafts that appear to have been distributed in Alabama, *it does not determine where the organs and bone grafts it tests are delivered*; it does not engage in any aspect of the delivery of the organs and bone grafts to the state; and it does not solicit directly or indirectly business in this state. . . . Nothing before us establishes that Auxilio Mutuo purposely directed any action toward Alabama.

*Ex Parte Auxilio Mutuo*, 945 So.2d at 447 (emphasis added). The court held that the plaintiffs had not presented evidence that Auxilio Mutuo had contacts with Alabama sufficient to confer personal jurisdiction. (*Id.* at 447). It further held that "Auxilio Mutuo ha[d] established a clear legal right to a dismissal of the Holsombacks' claims against it," and issued the writ of mandamus directing the trial court to "vacate the order denying the motion to dismiss and [] enter an order dismissing the Holsombacks' complaint insofar as it asserts claims against Auxilio Mutuo." (*Id.* at 447).

Here, the basis for exercising personal jurisdiction over Living Legacy is even weaker than in *Ex Parte Auxilio Mutuo*. Here, Living Legacy's UNOS region did not include Alabama. Nor had there been a significant percentage of prior organs from Living Legacy sent to Alabama for transplant. In *Ex Parte Auxilio Mutuo,* during the period between 1994 and 2001, 7% of the kidneys and bone grafts recovered within UNOS Region 3 ended up in Alabama hospitals. But, with the exception of the one at issue in this case, no kidneys procured by Living Legacy had been sent to Alabama in the twelve years preceding the lawsuit. (Doc. # 24 at 4). And, a mere ten (10) kidneys procured by Living Legacy were sent to Alabama between 1991 and 2002. (Doc. # 24 at 4).

Plaintiff argues that this court may exercise personal jurisdiction over Living Legacy because it packed and shipped the kidney to Alabama. But the facts show that, although Living Legacy may have packaged the kidney, they neither determined where it was shipped, nor were responsible in fact for delivery to Alabama. That is, as in *Ex parte Auxilio Mutuo*, "[n]othing before us establishes that [Living Legacy] purposefully directed any action toward Alabama." 945 So. 2d at 447. The facts in *Ex Parte Auxilio Mutuo* presented an even stronger case for the exercise of personal jurisdiction than those here, but the Alabama Supreme Court concluded that the trial court could not permissibly exercise personal jurisdiction over that out of state defendant. The same is true here. This court lacks personal jurisdiction over Living Legacy.

**IV.     Conclusion**

For the reasons discussed above, Living Legacy's Motion to Dismiss for Lack of Personal Jurisdiction is due to be granted. A separate order will be entered.

**DONE** and **ORDERED** this March 28, 2017.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE